# CITY NATIONAL BANK OF MORRISTOWN v. BALDWIN HARLE, et als.

Eastern Section.   February 11, 1928.

Petition for Certiorari denied by Supreme Court, April 25, 1928.

J. W. Thompson and Sizer, Chambliss & Sizer, of Knoxville, for appellant.

Donaldson & Montgomery, of Knoxville, and Charles S. Stephens, of Morristown, for appellee.

SENTER, J.  The original and supplemental bills filed in this cause seek to have two conveyances executed by defendant Baldwin Harle to his wife, Mrs. Emma Legg Harle, set aside as having been fraudulently executed. The bill alleges in substance that the complainant is a judgment creditor of Baldwin Harle, said judgment having been obtained on a note executed to the complainant bank by F. M. Lang with Miller & Harle as endorsers. The judgment, including interest and attorneys' fees on the note sued on, amounted to the sum of $21,157.31; that execution was issued on said judgment and returned nulla bona. The bill further alleges that on August 6, 1921, Baldwin Harle was insolvent; and that he was at that time indebted to the complainant bank, and was the owner of certain property situated in the state of Maryland, and also certain property situated in the City of Morristown, and that on said date of August 6, 1921, the defendant Harle executed the two deeds made the subject of attack by complainants, to his said wife, and that these conveyances were voluntary and without consideration, but executed for the purpose of hindering, delaying and defrauding the complainant bank, and for the purpose of defeating the rights of creditors. It is alleged in the bill that Mrs. Emma Legg Harle died testate, and that by the terms of her will she devised and bequeathed her property and all of her estate in trust to her niece, Mrs. Thompson, to be held in trust for the use and benefit of her husband, Baldwin Harle, during his lifetime, and at his death the property to go to Mrs. Thompson and other relatives named in the will. It is alleged that Mrs. Harle sold the Maryland property, and the proceeds of that sale, as well as the homeplace in Morristown should be subjected to the judgment debt of complainant against the defendant Baldwin Harle.

The defendants answered the bill by separate answers, denying the material allegations in the bill, and all allegations of fraud with

reference to the two conveyances attacked by the bill. The answers set up that the defendant Baldwin Harle, at the time he made the conveyances to his wife, was largely indebted to his wife; that the deceased, Mrs. Emma Legg Harle, was the owner of a tract of land situated in Cocke county, Tennessee, which tract of land was separated from the lands of her husband by the Chuckey River; that she became the owner by purchase of her tract of land in Cocke county, in 1898, and owned the same until 1919, when her land and also the lands of her husband adjoining, were sold, and that she and her husband executed the deed which conveyed her lands with the lands of her husband; that they received $90,000 as the consideration for the land, less $10,000 in commissions paid to a Mr. Miller; that the land of Mrs. Harle represented about one-third in value of the sale price; that the proceeds from the sale of the land, including the deferred payment notes amounting to $63,000, and $27,000 cash and bonds, were turned over to the defendant Baldwin Harle, and that this was done with the understanding between Harle and his wife that he would pay to her her part of the proceeds from the sale, representing the value of her land that had been conveyed, at any time she needed it or called for it; that he had used her part of the proceeds in his business, and that he conveyed the Maryland land and the Morristown homeplace to his wife in part payment of the amount that he owed to her, which was largely in excess of the value of the Maryland and Morristown property.

After the answers of the defendants had been filed the complainant filed an amended and supplemental bill, alleging in substance that Mrs. Harle had made a gift to her husband of the lands sold, and that he was not indebted to her on that account at the time he made the conveyance to her of the Maryland and Morristown property. It was further alleged that by permitting the notes to be made payable to her husband, representing the deferred payments, and permitting him to receive into his possession and to use the cash and bonds received as a part of the consideration, she had thereby clothed the defendant Harle with the indicia of ownership, and that the bank had extended the credit and accepted his endorsement of the note made the basis of the judgment it then held against him on the strength and faith and belief that Baldwin Harle was the owner of the proceeds derived from the sale of all the lands conveyed to Sprankle in 1919 by Harle and wife, and alleged that she was therefore estopped and those claiming under her, from denying that she had given the proceds from the sale of her land to her husband, Baldwin Harle.

The defendants filed answers to the amended and supplemental bill, in which they denied the allegations contained therein.

At the hearing of the cause the Chancellor sustained the bill and granted the relief prayed for. From this decree the defend-

ants have appealed to this court and have assigned numerous errors.

The Chancellor filed an elaborate finding of the facts and an opinion, and in which all the evidence is reviewed at length. There is but little controversy with reference to the material facts, and these may be summarized and insofar as they are material to the determination of the question presented on this appeal, will be stated as follows:

Mrs. Emma Legg Harle, the wife of Baldwin Harle, was the owner of a tract of land situated in Cocke county, Tennessee. Her husband owned a tract of land separated from Mrs. Harle's land by the Chuckey River. In 1919 Harle and his wife conveyed both tracts of land in one deed for the recited consideration of $90,000. $27,000 in cash and bonds represented the cash payment, and seven notes of $9,000 each, representing the deferred payments. The notes were made payable to Baldwin Harle, and the $27,000 in cash and bonds went into the hands of Baldwin Harle at the time the sale was made, as did also the seven notes. Harle and wife paid to R. H. Miller $10,000 as commissions, leaving the net amount received for all the lands $80,000. Mrs. Harle's tract of land was worth in value about one-third of the consideration paid for all the land. She had owned her tract of land since 1898. Baldwin Harle was a stockholder and director in complainant bank for many years, and was a man of considerable wealth, worth probably $80,000 to $100,000 at the time the land was sold. Baldwin Harle and wife did not have any children. In 1920 Baldwin Harle and R. H. Miller, operating under the firm name of Miller & Harle, engaged in the road contracting business. This firm entered into a contract with the Tennessee Highway Department for the construction of a portion of a highway in the spring of 1920. Shortly after taking the contract they subcontracted to one F. M. Lang a portion of this work. It became necessary for Lang to borrow money, and Miller & Harle aided him in procuring loans from complainant bank by endorsing his notes. These notes were renewed from time to time; the last renewal was on February 13, 1923. Lang, as the subcontractor, seems to have lost money on the contract, and this note was not paid, and it was made the basis of the judgment of about $21,000 obtained against Baldwin Harle, and upon which an execution was returned nulla bona.

The road contracting business proved a disasterous financial venture for Baldwin Harle. On August 6, 1921, he conveyed to his wife, Mrs. Emma Legg Harle, property which he then owned in the state of Maryland and also the property in Morristown, Tennessee, referred to as the homeplace. The deeds to the respective property conveyed to his wife recited a consideration of $5 cash, and other valuable considerations not set out. Harle was probably

insolvent at the time these conveyances were executed to his wife by reason of heavy losses sustained in the road contracting business, and if he was not actually insolvent at the time he was seriously financially involved, and the road contract was uncompleted, and we think he anticipated further losses.

Soon after Harle and wife sold the farm lands Harle discussed the matter of the sale with Mr. Fisher, the president of the complainant bank, and at that time showed Mr. Fisher the seven deferred payment notes payable to himself of $9,000 each. He was at that time a director and stockholder in the complainant bank, and was not indebted to the bank, and was known to Mr. Fisher to be in good financial condition. He was not attempting to obtain a loan from the bank at the time. Harle and Fisher were close personal friends. At the time Baldwin Harle formed the partnership with R. H. Miller to engage in the road contracting business and obtained the contract from the Tennessee Highway Department, the firm made application to a bonding company for their road contract. Mr. Fisher was the local agent of the bonding company, and took the application of Miller & Harle for the bond. A financial statement was made at the time the application was taken, and in this application or financial statement, Mr. Harle listed as a part of his assets then owned by him five of the $9,000 land notes. The other assets listed by the firm showed a total of about $95,000, with about $6,000 liabilities. The major portion of the assets listed belonged to Baldwin Harle according to the financial statement filed. This financial statement was not made for the purpose of obtaining any loans from the bank, and in taking the financial statement Mr. Fisher was acting as the local agent of the bonding company and not in his capacity as president of the bank.

In 1922, November or December, it appears that Mr. Fisher was informed by Mr. Harle that he had conveyed the home property in Morristown to his wife. It does not appear that Mr. Fisher, or the bank, knew until 1923 that Harle had conveyed to his wife the Maryland property, The last renewal of the Lang note with Harle as endorser was on February 13, 1923.

Mrs. Harle sold her interest in the Maryland property in 1923, and from which she realized $5,750 net. The title to the Morristown property was still in Mrs. Harle at the time of her death. By the terms of her will she devised and bequeathed all of her estate to her niece Mrs. Thompson, in trust for the use and benefit of her husband, with remainder to Mrs. Thompson and other relatives mentioned. Mrs. Harle died in June, 1924.

The record in this cause and the assignments of error present three propositions of law and fact that we think are determinative of the questions made on this appeal, and hence, we will not take up and dispose of the assignments of error in the order in which

they are filed and presented. These questions, are, first: Whether Mrs. Emma Legg Harle made a gift to her husband, Baldwin Harle, of the proceeds derived from the sale of her land in 1919? Second, if it was not a gift, is she, and those claiming under her, estopped from denying that it was a gift, because of her having permitted the notes to be taken in the name of Baldwin Harle, and permitting him to take into his possession, and to use for his own purposes and in his own business the notes and money and bonds received by him from the sale of her land, thereby clothing him with the indicia of ownership, and the bank relied upon said apparent ownership by Harle of said assets in extending the credit to him and accepting him as endorser on the Lang notes, and made said loans on the strength and belief that he was the owner of the same? And, third, was Baldwin Harle insolvent at the time he made the conveyances of the Maryland and Morristown property to his wife, or so far involved at that time, that he made the conveyances for the fraudulent purpose of hindering and delaying and defrauding the complainant in the collection of any indebtedness he then owed the bank?

If the actions and conduct of Mrs. Harle, in permitting the land notes and the cash and bonds derived from the sale of her land to go into the hands of her husband, and in permitting him to use the same in his business constituted, and was intended by her to be a gift from her to her husband, we think the conveyances made to her by her husband of the Maryland and Morristown property would constitute a fraud in law. We think it clear from the record that if Baldwin Harle was not actually insolvent on August 6, 1921, on the date he made the conveyance, he realized that he had sustained considerable losses on account of the road contract, which seriously impaired his finances, and he also anticipated even greater losses, and that insolvency would very probably result. If in this situation he made the conveyances to his wife, and was not indebted to her at the time, and the conveyances were voluntary and without valuable consideration, and the conveyances made operated to defeat, hinder or delay his creditors, the conveyances would be void as to creditors. (Churchill v. Wells, 7 Cold., 364; Allen v. Walt, 9 Heisk., 242; Prewitt v. Bunch, 101 Tenn., 723, and numerous other cases, and the general rule that "one must be just before he is generous.")

While there is some insistence by appellants that the record does not show that Harle was insolvent at the time he made these conveyances, and while it appears from the record that he was at that time the owner of property, including the Maryland property and Morristown property, bank stock and some other assets valued at around $40,000, the record shows that he was owing a considerable amount of debts besides his liability as endorser on the Lang

notes. The amount of his liabilities at that time is not definitely shown, and it was clearly within the power of Harle to show in a more definite way the amount of his liabilities. When it was within his power to make a full disclosure of his financial condition, and that was one of the material questions of fact presented under the issues, his failure to make such disclosure under the general rule, creates a presumption that it would be contrary to his interest and contention if the real facts were shown. The general rule on this subject is stated in 10 R. C. L., page 902, as follows:

"As a general rule the omission by a party to produce important testimony relating to a fact of which he has knowledge and which is peculiarly within his own reach and control, raises a presumption, open to explanation of course, that the testimony if produced, would be unfavorable to him."

In Hinkle v. So. Ry. Co., N. C., reported in 78 A. S. R., 685, it is said in the first headnote:

"Where a particular fact necessary to be proved, rests peculiarly within the knowledge of a party, upon him rests the burden of proof."

But as above stated, and independent of the generally recognized rule on the subject, we think it clear from the record that at the time Mr. Harle made the conveyances to his wife of the Maryland and Morristown property he realized that he was seriously involved financially and that the losses already sustained on account of the road contract, with a grave probability of sustaining further losses, would result in insolvency, and that it was in this situation that he executed the two conveyances in question to his wife. If these conveyances were voluntary and without real or valuable consideration, and Harle was not then indebted to his wife, then the conveyances would be a fraud in law as between creditors and Harle.

This brings us to a consideration of the question as to whether Mrs. Harle made a gift to her husband of her part of the proceeds from the sale of the land, or whether, under the facts, the relation of debtor and creditor obtained between them. If a gift, then the conveyances in question constituted a fraud in law as to existing creditors for the reasons above stated.

In 30 C. J., under the title of "Gift from Wife to Husband," Section 498, page 837, it is said:

"In general, wherever the husband receives money belonging to his wife's separate estate, the presumption is that he receives it as trustee or agent of the wife, although the circumstances of the particular case may raise a presumption of gift of the money by the wife to the husband, . . . But no presumption of a gift arises from the mere silence of the wife at the time her husband received the money, although in some jurisdictions it is held that a gift of rents or income will be

presumed where the husband receives the same without express dissent on the part of the wife.''

In the same volume and under the same title, Section 507, page 482, it is further said on this subject:

''The presumption that a husband who receives property belonging to his wife's separate estate received it as her trustee or agent, may be rebutted by evidence establishing a gift from the wife, but the evidence of the gift must be clear and conclusive. In general, in order to establish the fact of a gift from the wife to the husband, there must be satisfactory and positive evidence of such intent on her part.''

There seems to be a generally recognized distinction between the husband receiving the rents and income from his wife's property, which is presumed to be a gift, and where he receives into his hands the corpus or principal. In most jurisdictions it is held that where a husband receives the rents and income from his wife's estate, and by her consent uses it for his own purposes, a gift of such rents and profits by the wife to the husband will be presumed. (See notes, 30 C. J., 838).

With the passage of enactments generally referred to as Married Woman's Emancipation Acts, many of the states have placed a different construction on the question of presumptive gifts by wife to husband from that which had previously been the rule under the common-law conception of the relation of the husband and wife, and the common-law marital rights of a husband in his wife's property. In 12 R. C. L., under the head of ''Gifts by Wife to Husband,'' pages 928-9, it is said:

''Where a husband receives and uses the money or property of his wife, it has been held in a number of cases under the common-law conception of the relation of husband and wife, that it should be presumed that she intended to give it to him. Since the passage of the Married Woman's Property Acts, the courts generally have held that as to the principal of the wife's separate estate taken into possession and used by him even with her consent, it should be presumed that he received it as a loan or to hold it in trust for her benefit. This latter rule, it will be noticed, applies to the principal or corpus of the wife's property taken into possession by the husband.''

The case of Tellico Bank & Trust Co. v. Loomis, 147 Tenn., 158, recognizes this distinction. In the first headnote it is said:

''Under acts of 1919, Chapter 126, emancipating married women from all disability with respect to their property by reason of coverture, the only way that the husband can acquire the wife's property during coverture is by purchase of gift, and he does not acquire it by appropriation or reduction to

possession, which would have been sufficient to make the property his at common law.''

In the same case under the second headnote, it is further said:

"The fact that a wife intrusted to her husband the management of the funds resulting from the sale of her property and of a business purchased therewith, and took the notes for the purchase price of the property in his own name, does not establish a gift of the fund to her husband so as to subject it to liability for his debts.''

We think that the Tellico Bank & Trust Co. v. Loomis case, supra, is in accord with the rule as announced and above quoted in Corpus Juris and Ruling Case Law; that is, that the mere fact that the wife permits her husband to sell her real estate, and receives into his hands the cash payment from the purchaser, and has the deferred purchase money notes made payable to himself, and by her consent uses the money and notes derived from the sale in his own business, does not, of itself, create a presumption of a gift from the wife to the husband. While it is true in the Tellico Bank & Trust Co. case the opinion recites that, the wife said that she entrusted these funds to her husband as her agent or manager, and that he confirmed this statement, "and there is nothing to the contrary in the record," and in the present case all the evidence offered by the defendants in support of the theory that Mrs. Harle let her husband have the proceeds from the sale of her land with the understanding that he would turn the same over to her when she needed it or called for it, was excepted to by complainant, and the exceptions sustained by the Chancellor, and all the evidence on that subject was excluded by the Chancellor. We may digress at this point to refer to this evidence which was excluded. We think the Chancellor properly excluded the evidence of defendant Harle with reference to the conversations he had with his wife with reference to the understanding between them that he would return this money upon her request or demand, because we think it comes within the statutory inhibitions relative to transactions between husband and wife. However, certain questions and answers thereto appear in the cross-examination of the defendant Harle as follows:

"Q. Now, Mr. Harle, it seems that in August, 1921, you executed two deeds by one of which you conveyed to your wife a piece of property in Morristown, and by the other deed you conveyed a one-half interest in some property in Maryland. I will ask you to state how it was that you happened to make those deeds at that time and what was the purpose of them? A. I owed her, and just made the deeds to her.

"Q. At that time, had you repaid to her any part of the proceeds of the sale of her land to Sprankle? A. No, sir.

"Q. And her part of those proceeds, you say, was $30,000? A. Yes, sir."

This evidence was brought out on cross-examination, and the answers to the questions asked were clearly responsive, and we think that his answers to these questions are therefore competent. This is some evidence on the question of the intention of the parties, and to this extent sustains the contention of appellant that Mrs. Harle did not intend to make a gift to her husband of the proceeds received by him from her land. The complainant did not offer any evidence of a gift by Mrs. Harle, but relies upon the circumstances surrounding the transaction as creating a presumption of a gift. We are of the opinion that under the general rule, especially since the passage of the Married Woman's Emancipation Act (Chapter 26 of the Acts of 1919) the legal presumption is against the theory of a gift, and this seems to be the holding in the Tellico Bank & Trust Co. v. Loomis case, supra. We are therefore of the opinion that the learned Chancellor was in error in holding that it was a gift.

It therefore becomes unnecessary to consider or discuss the assignments of error based upon the action of the court in excluding the evidence of Mr. and Mrs. Thompson. Suffice it to say that we think this evidence was properly excluded on the grounds stated by the Chancellor.

On the question of an equitable estoppel, the learned Chancellor sustained the contention of complainant to the effect, that even if there was no gift shown, that by the actions and conduct of Mrs. Harle in permitting the notes to be made payable to her husband, and turning all the proceeds of the sale from the land over to him, and thereby clothing him with indicia of ownership, and that the bank was thereby led to believe that Harle was the owner thereof, and on this belief of his ownership, credit was extended to Harle, that Mrs. Harle, and those claiming under her would be estopped to deny that it was a gift. If the facts appeared from the record sufficient to support this contention that credit was extended to Harle on this account, then we think the contention and as held by the Chancellor, would be sound and Mrs. Harle and those claiming under her, would be estopped from asserting that she had not made a gift of her part of the proceeds from the sale to her husband. (30 C. J., 779 and cases cited). On this subject it is said in Tellico Bank & Trust Co. case:

"It may be where the wife permits her husband to handle her funds as this one did, clothing him with the indicia of authority or ownership, and credit is extended to the husband thereby, the wife would be estopped to assert her interest."

It will be observed that the court stated, "and credit is extended to the husband thereby, the wife would be estopped." This is but

the statement of the general rule. However, the question here made is whether credit was in fact extended by the bank to Harle on the strength of the knowledge which the bank had that those notes and the cash and the bonds representing the consideration for the sale of the land, belonged to Baldwin Harle. So it becomes necessary to examine the record with the view of determining whether the credit was extended to Harle, or his endorsement for Lang's obligation, was accepted by the bank on the strength of any knowledge it had that Harle was the apparent owner of these assets.

The only evidence in the record on that matter is the evidence of Mr. Fisher, president of the bank. He does not claim that he accepted Harle on Lang's notes (made the basis of the judgment upon which this suit was brought), either when credit was first extended to Lang on the notes, or when the same were from time to time renewed, on the strength of any knowledge he had that Harle was the apparent owner of the land notes, and which notes Harle showed him in 1919. While it is true that Mr. Harle showed Mr. Fisher these land notes soon after the land was sold, and Mr. Fisher knew that the notes were made payable to Harle, he did not at that time, or at any other time know about the $27,000 cash and bonds which went into the hands of Harle. Mr. Fisher was the only witness who testified for complainant. He does not state that the credit was extended to Harle, or that Harle was accepted as an endorser on Lang's notes, on the strength of, or because of any knowledge or belief that Harle owned the notes. We think a reading of the evidence of Fisher shows that he would have as readily accepted Harle as surety on the notes, and the renewals, or would as readily extended credit to Harle, independent of any knowledge he had of the notes being in the possession of Harle, or of Harle's ownership of the notes. Mr. Fisher and the other bank officials held Mr. Harle in the highest esteem. Mr. Fisher states that he never at any time requested Mr. Harle to furnish the bank a financial statement. It is evident from the evidence of Mr. Fisher that the apparent ownership of these land notes by Harle was not in any sense an actuating inducement to any credit extended by the bank to Harle. We find no evidence in the record to support the theory of complainant that the bank in extending credit to Harle, or in accepting him as endorser on Lang's notes did so on the strength of the ownership or apparent ownership of these notes by Harle. However, if there was evidence in the record to support the contention, it could not be fairly insisted that the bank at any time had any knowledge or information with reference to the $27,000 cash and bonds which went into the hands of Harle out of the sale price of the land. This represented about one-third of the total amount received for all the land, and it is conceded that Mrs. Harle's part of the land sold represented about

one-third of the total amount realized. The seven land notes representing the deferred payments taken in the name of Harle about equalled his two-thirds interest by deducting two-thirds of the commissions so paid to Miller for making the sale. Hence, if it be conceded that by permitting the land notes to be made payable to her husband, and that in so doing she clothed him with indicia of ownership, and if it also appeared that the bank extended the credit to Harle, or accepted him as endorser on Lang's note, on the faith and belief of Harle's ownership of these land notes, the fact remains that, as to $27,000 which Harle received from the sale of the land, the bank had no knowledge of his having received the cash and bonds, and certainly did not extend any credit to Harle on the faith of Harle having that part of the sale price in his hands, or subject to his debts.

There are other facts and circumstances in the record which go to negative the theory that the bank relied upon its knowledge or belief that Harle owned the proceeds of the land sale in extending any credit to him.

As heretofore stated, if it appeared that the bank had been mislead to its prejudice, or had relied upon the apparent ownership of Harle of the land notes and the cash and bonds received by him from the sale of the farm lands, in extending the credit to Harle, it would operate to estop Mrs. Harle and those claiming under her, but for the reasons above stated, we find nothing in the record that would warrant that conclusion. In applying the doctrine or rule of an equitable estoppel, or an estoppel in pais, each case must depend and be controlled by the facts of the case.

It results that the assignments of error based on these questions will be sustained, and the decree of the Chancellor is reversed. The costs of the cause, and the cost of this appeal will be paid by complainant bank.

Owen and Heiskell, JJ., concur.